O/JS-6

UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| Chevron U.S.A., Inc., | ) | CASE NO. SACV 07-0818 DOC (ANx) |
|---|---|---|
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT |
| M & M Petroleum Services, Inc., | ) | |
| Defendant(s). | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Pursuant to Plaintiff Chevron U.S.A., Inc.'s ("Plaintiff") waiver of jury trial, the Court conducted a six-day bench trial.  The trial concluded on July 10, 2009.  Both Plaintiff and Defendant M&M Petroleum Services, Inc. ("Defendant") filed supplemental briefing, including Revised Proposed Findings of Fact and Conclusions of Law on July 20, 2009.  Having considered the submissions by the parties and all admissible evidence, the Court hereby enters its Findings of Fact and Conclusions of Law in conformity with Federal Rule of Civil Procedure 52.

**PREAMBLE**

i.  The Court is aware of the potential harm created by decreased competition in the oil industry, particularly through the increase of vertical monopolies within oil companies.  The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq*, prevents vertical monopolies and enables competition.  Thus, the PMPA protects the public from the harmful repercussions that decreased competition necessarily entails.  However, where, as here, the conduct by a dealer is so egregious as to warrant the termination of a dealer lease agreement, the station must be ceded to the company, notwithstanding the grave concerns expressed by this Court.

**FINDINGS OF FACT**

**Background Facts**

1.  Plaintiff is a corporation that, among other things, sells gasoline to consumers through Chevron-branded retail service stations.

2.  Some Chevron-branded retail service stations are company-owned and operated ("COCO Stations").  Some other Chevron-branded retail service stations are operated by independent dealers that enter into a lease with Chevron to sell Chevron-branded gasoline under the Chevron brand (i.e., company-owned, company-operated statiosn or "CORO Stations").

3.  Defendant is a corporation that operates a CORO service station located at 2121 South East Bristol Street, Newport Beach, California (the "Station"), which it leases from Chevron pursuant to written agreements described below.

4.  Mansoor Ghaneeian ("Ghaneeian") is currently a 50 percent shareholder of M&M and M&M's designated dealer of record.

5.  For the entire time that M&M has been a Chevron dealer, it has had written Dealer Agreements (as hereinafter defined) with Chevron.

6.  Chevron and M&M entered into a Dealer Lease, Dealer Supply Contract, and related agreements, dated April 15, 1998, in which M&M leased the Station from Chevron.

7.  Chevron and M&M entered into a subsequent Dealer Lease, Dealer Lease Supply Contract, Optional Temporary Partial Rent Waiver and Electronic Transaction Authorization Agreement (the "Rent Waiver") and related agreements, dated May 27, 2005 (collectively, the "Dealer Agreements"), in which M&M leased the Station from Chevron.  The May 27, 2005 Dealer Agreement is the operative Dealer Agreement.  Ex. 94.

8.  At all relevant times related to this litigation, the Station consisted of three profit centers for rent calculations – motor fuel sales, automotive service bay ("ASB") sales, and convenience store and car wash sales (otherwise known as alternative profit center or "APC" sales).

9.  Ghaneeian purchased the Station in 1997 for approximately $800,000.  Ghaneeian thereafter invested more than $200,000 to improve the Station. 06/05/09, Vol. II, 14:8-16:4 [Ghaneeian].

10.  M&M agreed to comply with all applicable federal, state and local laws and regulations relevant to the operation of the Station.  Dealer Lease §2(c); Dealer Supply Contract §2(b).

11.  Ghaneeian signed and understood the obligation to comply with all requirements of the Dealer Agreements.  06/05/09, Vol. I at 33:21-39:15.

12.  Up until July 2005, rent for ASB sales was fixed at $3,271 per month.  Starting in July 2005, pursuant to the Rent Waiver, base rent for ASB sales was set at $3,271 a month or 10 percent of M&M's monthly ASB Sales.  Thus, if sales did not exceed $37,210, rent was fixed at $3,721.  Ex. 94-043.

13.  Ghaneeian understood that by voluntarily electing the Rent Waiver, he chose to pay rent to

3

Chevron based on a percentage of revenue ("Percentage Rent")(so long as said revenue exceeded $37,210), rather than to pay the Base Rent for the term of the Lease: 1st Lease Year $34,666.67; 2nd Lease Year $35,360; 3rd Lease Year $36,067.20; 06/05/09, Vol. I at 37:13-39:15.

14.  Pursuant to the Rent Waiver, M&M must pay Chevron monthly Motor Fuel Facilities Rent based upon reported motor fuel sales, Automotive Service Bay Rent based upon M&M's ASB sales, and Alternative Profit Center Rent based on M&M's non-motor fuel sales and non-ASB sales and must report such sales to Chevron in accordance with procedures in Chevron's Rental Accounting Guide.  Ghaneeian knew that the monthly ASB rent was the greater of $3,721 or 10% of M&M's monthly ASB sales.  Ex. 94-042 to 94-044 (¶ 1); 06/05/09, Vol. I at 37:2-39:15; 43:12-44:6.

15.  The Dealer Agreements require M&M to use the Chevron electronic point of sale ("EPOS") system, which is located at the Service Station, to report each and every gasoline, convenience store, and ASB sale.  There are no exceptions to this requirement in the relevant agreements between the parties.  Such sales must be reported to Chevron in order to form the basis for Chevron's Percentage Rent calculations.  FPCO Stip.  Fact 6(d);  Ex. 94-043 and 94-044; Ex. 120 (see, e.g., 120-007).

16.  Chevron provided M&M with a monthly rent worksheet setting forth rent calculations and sales figures previously reported by M&M to Chevron.  Under the Dealer Agreements and corresponding Lessee Dealer Rental Accounting Guide, M&M was required to report all sales to Chevron at specified time intervals.  Ex. 211; 120; 94; FPCO Admit. Fact 5(k).

17.  M&M is obliged to create and maintain its financial records pursuant to the requirements of the Chevron Rental Accounting Guide.  Upon 72 hours' notice, Chevron is entitled to audit the dealer's source documents to verify compliance, including the obligation to fully report all sales

to calculate the Percentage Rent.  M&M is obliged to provide Chevron's auditor with all records required by the Chevron Rental Accounting Guide.  Dealer Lease 4(d); Ex. 94-004 to 94-005; FPCO Admit. Facts 5(h)-(i).

18.  Ghaneeian knew that Chevron's Rental Accounting Guide (provided to M&M and expressly incorporated into the Dealer Lease and the 1998 Dealer Lease) identifies the business records that M&M is required to maintain (and provide to Chevron's auditor upon request), and that failure to comply with the provisions of Chevron's Rental Accounting Guide "is a non-curable breach of your Dealer Lease and may result in the termination of that lease."  Ex. 120-003, 214-004, 215-004; 06/05/09, Vol. I at 35:25-37:1.

19.  Pursuant to the Rental Accounting Guide, M&M was required to create, maintain, and provide to the auditor the following documents: (i) Monthly financial statements, together with all source documentation, (ii) Federal, State and Local Income Tax Returns, and (iii) Original accounting records and worksheets to support and reconcile differences between sales per EPOS and sales per financial statements/tax returns.  FPCO Admit. Fact 5(l); Ex. 120-022; 214-042; 215-038 to 215-039.

20.  M&M knew that "[a]udits that reveal reporting discrepencies or other breaches of your Dealer Lease may result in termination of your Dealer Lease."  FPCO Admit. Fact 5(l); Ex. 120-034, 214-052, 215-045.

**Chevron's CORO Exit Strategy**

21.  In recent years, Chevron's CORO stations have drastically reduced in number.  In the late 1990's, Chevron had approximately 750 CORO stations nationally.  Today, Chevron has only approximately 100 CORO stations nationally.  06/04/09 [Norris]; 06/05/09, Vol. I, 4:17-5:8 [Norris].

22.  The dramatic decrease in the number of CORO stations nationally is attributable to what Chevron calls its "CORO Exit Strategy."  Since sometime in the late 1990's, Chevron has sought to reduce and eliminate CORO Stations by, among other things, converting profitable CORO Stations into COCO Stations.  06/03/09 [Cowan]; 06/04/09 [Norris]; 06/05/09, Vol. I, 4:17-5:8 [Norris].

23.  By converting a profitable CORO Station into a COCO station, Chevron thereby keeps the profit that would otherwise go to the independent dealer.  06/03/09 [Cowan]; 06/04/09 [Norris]; 07/09/09 [Logan].

24.  Since Ghaneeian began operating the Station in 1998, the revenue generated by the Station dramatically increased.  In 1998, M&M reported $3,918,609 in gross revenue.  This number consistently increased each year – $4,412,710 in 1999; $5,541,411 in 2000; $5,540,630 in 2001; $5,622,165 in 2002; $6,400,718 in 2003; and $7,383,011 in 2004.  Ghaneeian also created a convenience store at the Station and made the Station's car wash operable, thereby generating some increased revenue for the Station.  06/05/09, Vol. II, 16:5-17:3 [Ghaneeian]; Ex. 6-010 to 6-011; 13-005; 13-008 to 13-010; 13-013; 13-015 to 13-016; 53-017 to 53-020; 208-1261; 208-2394; 208-3392 to 208-3393 and 208-4358.

25.  Chevron executes conversion of profitable CORO Stations to COCO Stations by purchasing stations from the retail operators.  CORO Stations may also be so converted if Chevron terminates the Dealer Agreements based on a purported breach of the parties' agreement, which enables Chevron to acquire the station for free.  06/04/09 [Norris]; 07/09/09 [Logan].

26.  M&M is a CORO Station that has become increasingly profitable under Ghaneeian's operation.  06/05/09, Vol. II, 16:5-17:3 [Ghaneeian].

27.  In approximately 1999, Chevron sought to convert the Station to a COCO Station by

purchasing it from Ghaneeian.  The offer to purchase the Station, however, was for less than the amount for which Ghaneeian purchased the Station two years earlier.  Ghaneeian rejected the offer.  Since the rejection, Chevron has never again offered to purchase the Station from Ghaneeian.  06/05/09, Vol. II, 25:11-24 [Ghaneeian].

**Chevron's Previous Unsuccessful Efforts to Terminate M&M**

28.  Since 2002, Chevron has attempted to reacquire the Station.  [06/05/09, Vol. II, 25:25-26:7, 27:8-29:2 [Ghaneeian]; Ex 76; 79.

29.  Chevron's first attempted termination occurred in March 2002 and culminated in an arbitration proceeding in October 2003.  Ex. 76.

30.  Prior to the completion of the arbitration, Ghaneeian met with Chevron representative Alicia Logan for the purpose of attempting to settle the matter.  During the meeting, Ghaneeian also sought permission to purchase the Station from Chevron or, in the alternative, to convert the ASB to a convenience store.  06/05/09, Vol. II, 23:18-27:2 [Ghaneeian]; 07/09/09 [Logan]; Ex. 304.

31.  During the meetings, Ms. Logan refused Ghaneeian's requests.  An internal memorandum reveals that she said, among other things:

(a) "He believes we have purposely tried to take the Station away from him. ... He believes that he is a good deal because his net profit has steadily increased over the last five years. ...  I told him an idiot would make money at his site given its location."

(b) "[I]f Chevron won, [it] would get the station for free, and [Ghaneeian] would lose everything and that worse case scenario Mano [Ghaneeian] winning would keep him in place as a 3 party and that [Chevron] would not ever sell him the site.  He [would] have to continue to operate it as an ASB.  So, there was nothing but upside potential for pursuing the legal course for Chevron.  Mano said that he understood that I had to do what I thought was best."

(c) "I told him I was not happy with his station image."  06/05/09, Vol. II, 26:8-27:2 [Ghaneeian]; 07/09/09 [Logan]; Ex. 304-001 to 304-003.

32.  Ultimately, on October 9, 2003, the arbitrator enjoined Chevron from terminating its Dealer Lease Agreement with M&M and ordered Chevron to renew its Dealer Lease Agreement with M&M.  Ex. 76.

33.  Two months later, Chevron again sought to terminate M&M's Dealer Lease Agreement by serving a December 16, 2003 Notice of Termination.  On March 19, 2004, Chevron, for the first time, filed a federal lawsuit to terminate its Dealer Lease Agreement with M&M.  SACV 04-0333 DOC (JWJx).  Chevron brought suit as it had learned that Defendants had made an unauthorized assignment of the Dealer Agreements to M&M from former co-owner Florentino Apeles (such assignment was not authorized by Chevron as Ghaneeian had continually failed the requisite Dealer Skills Test).  This lawsuit was terminated based on summary judgment motion on June 22, 2004, as this Court found that Chevron's lawsuit was barred by the previous arbitration award, on res judicata grounds.  Ex. 77; 79.

34.  Chevron has a written internal policy that, if it loses a termination action, it pays for the attorneys' fees incurred by the dealer.  Ex. 307-003.  Despite losing the prior federal and state termination actions, Chevron has never paid attorneys' fees incurred by M&M.  Ex. 307-003; 06/04/09 [Norris]; 06/05/09, Vol. I, 16:22-17:6 [Norris]; 06/05/09, Vol. II, 28:18-20 [Ghaneeian].

35.  The Court is gravely concerned about Chevron's general practice of attempting to reacquire CORO stations.  Ms. Logan's statement that she could get the Station for free demonstrates that Chevron has desired to obtain this station for some time.  The Court recognizes that Chevron, like most oil companies, would like to acquire CORO stations for as little money as possible.  Importantly, however, evidence was not presented that proves that Chevron brought the instant

1    lawsuit merely as a pretext for acquiring the station for free.  As more fully outlined below,

2    considerable evidence has been presented to this Court that Ghaneeian engaged in heinous

3    practices, such as likely underreporting the Station's revenue to both the state and federal

4    government, as well as Chevron itself.  Ghaneeian's practices have harmed Chevron financially

5    and, if Ghaneeian is allowed to continue to operate the Station, hold the potential to significantly

6    harm Chevron's reputation as they will constitute a validation of Ghaneeian's deception and

7    dishonesty.  It is on that basis that Chevron brought the instant lawsuit.

8

9    **Chevron's Attempted Examination of M&M's Financial Records**

10   36.  Chevron's May 7, 2007 letter to M&M (the "Audit Notification Letter") gave notice that on

11   May 22, 2007, pursuant to the Dealer Agreements, Chevron's outside accountant, Mario

12   Oseguera of Oseguera & Associates LLP ("Oseguera"), would review all of M&M's books and

13   records for the Station for the period from January 1, 2004 through December 31, 2006 (the

14   "Review").  FPCO Admit. Fact 5(m); Ex. 24.  The stated reason for the audit was to determine if

15   Chevron had been paid all rent due under the Dealer Agreement.  Ex. 24.

16

17   37.  The Audit Notification Letter required M&M to produce to Oseguera the following for

18   2004-2006:  profit and loss statements, income statements, operating statements, balance sheets,

19   and federal, state and local income tax returns related to the business and related source

20   documentation.  FPCO Admit. Fact 5(m); Ex. 24.

21

22   38.  On May 22, 2007, Oseguera went to M&M to perform the Review.  FPCO Admit. Fact 5(p).

23   In the afternoon of May 22, 2007, in response to Ghaneeian's request, Oseguera met with

24   Ghaneeian and answered his questions.  Specifically, Oseguera answered that M&M was

25   selected randomly for the Review, that M&M must maintain records for three years and that

26   Oseguera found discrepancies for various months including August 2004 and August 2006

27   between the actual ASB sales and the amounts reported to Chevron and to the California and

28   federal taxing authorities.  Oseguera asked Ghaneeian if he had any explanation for, or

1   documents which would address, the discrepancies, and Ghaneeian responded that he did not.
2   06/04/09, Vol. I at 28:12-31:25 [Oseguera]; 07/08/09, Vol. I at 70:7-71:15 [Ehsani].

3

4   39.  M&M bookkeeper Afsaneh Ehsani ("Ehsani") spoke to Oseguera on May 21, 2007 and
5   again after May 22, 2007 and told him that M&M maintained a second set of financial records
6   that reflect all ASB sales.  Ehsani specifically directed Oseguera to review the segregated,
7   yellow-highlighted set of ASB work orders maintained separately in the monthly financial
8   record boxes, which she called "Fly-Away Work Orders."  07/08/09, Vol. I at 9:6-10:13; 69:13-
9   70:6; 74:12-75:10 [Ehsani].

10

11  40.  On June 20, 2007, Oseguera returned to M&M to, on his own accord, review the Fly-Away
12  Work Orders and analyzed all of the work orders for the months of May 2004; June 2004;
13  August 2004; June 2005; and August 2006.  FPCO Admit. Fact 5(q); Ex. 6-014; 06/04/09, Vol. I
14  at 42:17-46:9 [Oseguera].

15

16  41.  M&M did not produce to Oseguera material business records that the Dealer Lease requires
17  it to maintain and produce for audit, including but not limited to, documents that "support and
18  reconcile differences between sales per EPOS and sales per financial statements/tax returns."
19  Ex. 6-008, 215-034 to 215-040; FPCO Admit. Fact 5(l).

20

21  42.  M&M did not produce to Oseguera its second set of books, composed of handwritten ledger
22  sheets – referred to by several M&M employees as the "Green Book" or the "Bible" – and two
23  computer-generated spreadsheets entitled the "Mano" spreadsheet (file name: expenses.xls and
24  expenses2.xls) and the "Shop" spreadsheet (file name: shop.xls) (collectively, the "Secret
25  Books").  The "Green Book" contains a handwritten calculation of M&M's revenue including
26  ASB revenue that M&M did not report to Chevron or, likely, to taxing authorities.  The "Shop"
27  spreadsheet documents M&M's more accurate ASB revenue figures, which correspond to the
28  handwritten calculations in the Green Book.  The "Mano" spreadsheet records M&M's

1  unreported cash revenue and cash payments to M&M's employees, Ghaneeian, and Ghaneeian's

2  family.

3

4  43.  Oseguera testified that the Shop and Mano spreadsheets were among the documents that

5  M&M was required to produce for his review.  06/04/09 [Oseguera] 06/05/09, Vol. I at 120:19-

6  121:2 [Ghaneeian].  M&M's failure to produce the documents to Oseguera deprived Chevron of

7  the ability to determine whether M&M had reported all of its sales to Chevron.  Ex. 32; 90; 111-

8  113; 133 and 225.

9

10  44.  Oseguera prepared an Agreed-Upon Procedures Report, dated June 29, 2007, and provided

11  it to Chevron (the "Oseguera Report").  FPCO Admit. Fact 5(r); Ex. 6.

12

13  45.  Although M&M paid Chevron $264,874 in rent in 2004; $224,511 in rent in 2005; and

14  $258,289 in rent in 2006; Oseguera reported that this represented a significant underreporting of

15  M&M's actual ASB sales to Chevron, in violation of the Dealer Agreements.  This practice was

16  in place during the entire three-year audit period of 2004-2006.  For each month analyzed,

17  Oseguera found work orders, which were maintained separately, with the work order numbers

18  highlighted in yellow.  The revenue from those work orders was not reported to Chevron.

19

20  46.  Oseguera verified that the ASB work order sales that were not reported to Chevron were

21  also omitted from M&M's financial statements and likely also from M&M's federal and

22  California sales and income tax returns.  Ex. 6; 06/04/09, Vol. I at 25:19-26:16; 43:17-44:14

23  [Oseguera].

24

25  **Chevron's Termination Decision**

26  47.  Norman A. Norris ("Norris") of Chevron made the decision to issue the Notice of

27  Termination to M&M.  Ex. 7; 06/05/09, Vol. I at 19:17-20:3 [Norris].  In making the decision to

28  terminate the dealership, Norris did not take direction from anyone else.  06/05/09 [Norris].

48.  Norris based his decision to authorize issuance of the Notice of Termination on the information in the Oseguera Report, 06/05/09, Vol. I at 17:20-25 [Norris].

49.  At the time he decided to terminate the dealership, Norris did not know Ghaneeian and had no knowledge of the profitability or unprofitability of M&M's business.  06/05/09 [Norris]. Norris was not responsible for the purchase or sale by Chevron of service station dealers' operating rights.  06/05/09 [Norris].  Norris's decision was unrelated to, and unaffected by, any conversations between Ghaneeian and Chevron personnel with respect to the purchase of the Station.  06/05/09 [Norris].

**Termination of the Dealership**

50.  On or about July 13, 2007, Kevin Maloney, a Franchise Sales Specialist for Chevron, hand-delivered to Ghaneeian the Notice of Termination, together with a copy of the Accountant's Report and the Department of Energy's Summary of Title I of the Petroleum Marketing Practices Act.  FPCO Stip. Fact 6(m); Ex 7.

51.  The Notice of Termination states that Chevron's termination of the Dealer Agreements with M&M was based on the following reasons:

(a) failure to maintain records; §7(b)(1) of the Dealer Lease;

(b) failure to report all sales to Chevron; §7(b)(1) of the Dealer Lease;

(c) failure to pay Chevron all rents due; §7(b)(1) and §7(b)(3) of the Dealer Lease and §9(b)(3) of the Dealer Supply Contract;

(d) failure to comply with law in failing to report all sales on state sales tax returns and on state and federal tax returns, §2(c)(11) of the Dealer Lease and §2(b) of the Dealer Supply Contract, §§7(b)(1) and §7(b)(4) of the Dealer lease, and §§7(b)(1) and 7(b)(4) of the Dealer Supply Contract;

(e) fraudulent failure to report all sales to Chevron and to the relevant taxing authorities as required by law under §7(b)(8) of the Dealer Lease and §7(b)(8) of the Dealer Supply Contract;

1  (f) breach of Dealer Supply Contract, which constitutes a breach of the Dealer Lease;

2  (g) the fact that termination of the Dealer Lease automatically terminates the Dealer Lease; and

3  (h) breach of the Dealer Lease, which constitutes a breach of the Dealer Supply Contract (and,

4  likewise, termination of the Dealer Lease automatically terminates the Dealer Supply Contract).

5  FPCO Stip. Fact 6(n); Ex 7

6

7  52.  The Notice of Termination states that M&M's petroleum franchise would terminate "90

8  days after" M&M's receipt of the notice.  FPCO Stip. Fact 6(o); Ex 7.

9

10  **The Material Financial Impact of M&M's Misconduct**

11  53.  Chevron's expert accounting witness, Michael Spindler ("Spindler") of Deloitte Financial

12  Advisory Services LLP, analyzed M&M's financial records, including the Secret Books and

13  concluded:

14  (a) The American Institute of Certified Public Accountants recognizes an agreed-upon

15  procedures report, as prepared by Oseguera, as an appropriate means to address third-party

16  contractual compliance.

17  (b) For the years 2004-2006 there were differences, consistently, between ASB revenue in the

18  ASB service orders versus ASB revenue reported to Chevron and in M&M's income statements.

19  (c) Underreporting of ASB revenue in income statements resulted in underreporting in M&M's

20  tax returns for the years 2004, 2005 and 2006.

21  (d)  For the years 2004-2006 there were differences, consistently, between ASB revenue

22  reflected in the "Mano" and "Shop" spreadsheets and ASB revenue reported to Chevron and in

23  M&M's income statements.  Ex 111; 112; ; 113; 133.  These differences were due to a

24  systematic and deliberate underreporting of revenue.

25  (e)  M&M did not report the following ASB revenue to Chevron in 2004:  $93,310.18; 2005:

26  $76,707.18; and 2006:  $26,585.16, for a total of $196,602.52.

27  (f)  M&M's reported net income was:  $325,902.58 (2004);  $162,215.71 (2005);  $360,266.72

28  (2006).

(g)  M&M's unreported ASB revenue as a percentage of M&M's net income per its income statements (as adjusted to include the unreported ASB revenue) is: 22.26% (2004); 32.11% (2005); 6.87% (2006); 3-Year Average: 18.81%.

(h)  The amount of M&M's unreported ASB revenue as compared to M&M's net income per its income statement is material.

(i)  M&M's reported ASB Revenue was: $417,732.13 (2004); $315,659.67 (2005); $277,427.42 (2006); for a total of: $1,010,819.22.

(j)  M&M's unreported ASB revenue as a percentage of M&M's ASB revenue (as adjusted to include the unreported ASB revenue) is 18.26% (2004); 19.55% (2005); 8.74% (2006).  The 3-Year Average is 16.28%.

(k)  The amount of M&M's unreported ASB revenue as compared to M&M's ASB revenue per its income statement is material.  Ex 216-217; 239; 07/08/09 [Spindler].

54.  M&M's accounting expert, James Skorheim, agreed that M&M's unreported ASB revenue is material.  07/09/09 [Skorheim].

**Harm to Chevron from M&M's Misconduct**

55.  Chevron relies on Dealers like M&M to fully and accurately report all of its sales to Chevron.  Chevron relies on such accurate and full reporting in order to enable it to calculate the Percentage Rent and to keep contemporary sales records.

56.  The monthly Base Rent under the 2005 Lease was $34,067.20 (1st Lease Year; beginning July, 2005) and $35,360 (2nd Lease Year).  M&M elected not to pay the Base Rent under the Dealer Lease, but instead elected the lower Percentage Rent.  By underreporting its revenue, M&M violated the Rent Waiver's revenue reporting, record keeping, and audit requirements and prevented Chevron from accurately calculating the Percentage Rent.  M&M also deprived Chevron of the higher Base Rent to which it was entitled under the Dealer Lease.

57.  The minimum Percentage Rent ($3,721 or 10% of $37,210) for the period beginning July 2005 was determined based on the ASB revenue that M&M reported historically.  Because M&M intentionally underreported its ASB revenue to Chevron for at least 2004, M&M deprived Chevron of the ability to establish a fair Percentage Rent based on M&M's actual ASB revenue for 2004.

58.  M&M represents Chevron's brand and products to the public, and Chevron relies on dealers to be honest, ethical, and fair and to comply with all laws and Dealer Agreements.

59.  For at least the period 2004-2006, M&M and its owner, Ghaneeian, knowingly, systematically, and consistently underreported ASB revenue to Chevron and, likely, also underreported its revenue to the State of California, and the Internal Revenue Service ("IRS").

60.  M&M admits that Ghaneeian and his family members received cash payments and that he knew that M&M used cash to pay various employees and his personal credit card bills.  Ghaneeian did not submit any evidence that the personal income that was paid in cash was reported on state and federal income tax returns.  06/05/09, Vol. II at 66:19-67:10, 69:14-70:10; 85:21-89:5 [Ghaneeian].  The Court finds that the cash income to Ghaneeian and his family was highly likely not reported by M&M and that they likely engaged in tax fraud.  This is corroborated by the Court's finding,  based on all relevant evidence, that Morteza Zarrabi ("Zarrabi") advised Ehsani to report M&M's and Ghaneeian's likely tax fraud to the IRS and that, prior to that conversation, Ehsani was unaware that she could do so.  07/08/09, Vol. I at 28:5-29:7, Vol. III at 12:2-14 [Ehsani].  In response, Ehsani contacted the IRS and filed an Information Referral Sheet on May 1, 2007 and a supplemental Information Referral Sheet on June 14, 2007.  07/08/09, Vol. I at 19:17-21:17 [Ehsani]; Ex 14-544 to 14-545.

61.  M&M's likely violation of tax laws creates the risk that taxing authorities will (1) prosecute or sue M&M and/or Ghaneeian and that they (2) may close the Station for unpaid taxes, which

would significantly reduce or eliminate M&M's sales – and thus rent paid to Chevron – and cause enormous harm to Chevron's reputation and its ability to serve customers.

**M&M's Secret Books and Post-Termination Spoliation of Evidence**

62.  Chevron sent a document preservation letter to M&M on July 17, 2007, reminding M&M that it was required to preserve and maintain all documents relevant to this litigation including all financial records.  Docket 138 (Ex. 2), pages 32-33.

63.  On November 7, 2007, Chevron propounded requests for production of documents ("Document Requests") including a request for all final and draft M&M's financial documents. Ex. 224-012 to 224-013 (Document Requests 18 and 19).

64.  In its December 17, 2007 response to Chevron's Document Requests, verified by Ghaneeian, M&M agreed to "produce any and all documents in its possession which are responsive" to Document Requests Numbers 18 and 19, but that it:  "has been unable to acquire and/or find any of the requested documents because the requested documents either never existed, have been lost and/or inadvertently destroyed, or have never been in the possession, custody, or control of the Responding Party."  Ex. 224-012 to 224-013.

65.  In January 2008, Ehsani informed Chevron's counsel that M&M and Ghaneeian maintained Secret Books to defraud Chevron and avoid paying taxes.

66.  While employed at M&M, Ehsani copied some of M&M's financial records that evidence M&M's fraud.  07/08/09, Vol. I at 16:20-18:11 [Ehsani].

67.  From 1997 to 2007, M&M engaged H&N Financial Services, Inc. ("H&N") to prepare M&M's financial statements and tax returns, using the financial information provided by M&M, but M&M never provided H&N with the Secret Books.  As a result, M&M's official financial

1  statements and, likely, its State and Federal sales and income tax returns did not report all of

2  M&M's revenue.  FPCO Stip. Facts 6(e)-(g).

3

4  68.  Chevron served Ehsani with a deposition subpoena dated February 26, 2008 requesting that

5  she produce M&M-related documents then in her possession.  Ex 38.

6

7  69.  On February 27, 2008, M&M filed a complaint in Orange County Superior Court against

8  Ehsani, for allegedly misappropriating M&M's financial statements and other documents, and

9  seeking a temporary restraining order ("TRO") to prevent Ehsani from providing documents to

10  Chevron ("State Court Action").  Ex 107.

11

12  70.  In response to Chevron's subpoena, on March 1, 2008, Ehsani produced copies of M&M

13  documents to Chevron's counsel by priority mail, which Chevron's counsel received on March 4,

14  2008 but did not open (the "Gray Documents," Ex. 90; 225).  Pursuant to Judge Gray's request

15  during a State Court hearing on the TRO, Chevron's counsel forwarded the unopened package to

16  the Superior Court, where it was sequestered.

17

18  71.  Chevron intervened in the State Court Action and moved for access to the subpoenaed

19  M&M records.  M&M filed Ghaneeian's declaration on May 30, 2008, in which he admitted that

20  the Gray Documents contain "hundreds of in-house hand-written and computer generated notes

21  and records of M&M's business . . . ."  Ghaneeian further stated that "Ehsani created and/or

22  instituted many computer record keeping programs for record-keeping purposes.  It is my sincere

23  belief that she created these in-house records that were confidential and not to be shared with

24  anyone."  Ex 97-007(21).

25

26  72.  On July 3, 2008, Chevron filed in this Court a motion to compel further responses to

27  Document Requests 18 and 19 and a motion to enforce its deposition subpoena and to gain

28  access to the Gray Documents.  Docket Nos. 27, 28.  M&M concurrently filed a motion for a

1  protective order to prevent Chevron from gaining access to the Gray Documents.  Docket 25.

2

3  73.  On July 30, 2008, Judge Nakazato granted Chevron's motions and denied M&M's motion,

4  ordering M&M to produce:  "the originals of any documents contained in 'the Bible' or 'the

5  Green Book.' . . .  [and] serve a verified supplemental response to Request Nos. 18 ad 19 that

6  shall be signed by Mr. Ghaneeian in his capacity as M&M's president that must verify that

7  M&M has produced all responsive documents in its possession, custody or under its control, as

8  directed by this Order.  To the extent M&M maintains that it is unable to comply with this

9  Order, its verified supplemental response must give a full, complete and non-evasive explanation

10  for M&M's inability to comply or produce a specific document or documents."  Docket 69.

11

12  74.  On August 19, 2008, M&M provided a copy of a disk previously produced in response to

13  Chevron's subpoena to M&M's former accounts, which did not contain documents subsequently

14  found on M&M's computer by Chevron's forensic analyst.  M&M also provided a supplemental

15  response, verified by Mr. Ghaneeian, which states:  "M&M does not know what 'the Bible'

16  and/or 'the Green Book' is and/or to what such terms refer.  To Responding Party's knowledge

17  and belief there is and has never been a 'Green Book' or 'Bible'.  Because such documents do not

18  exist, Responding Party is unable to respond to this request to produce any documents that make

19  up 'the Bible' and/or 'the Green Book'.  Responding Party has undertaken a diligent and

20  reasonable search and is informed and believes that all documents requested in the

21  above-referenced request that are in Responding Party's possession, custody, or control have

22  been produced to Propounding Party at this time."  Ex. 106-003 to 106-005.

23

24  75.  M&M continued to falsely maintain that the Secret Books did not exist and concealed the

25  Secret Books.  Chevron again demanded that M&M produce responsive documents including

26  the Secret Books.

27

28  76.  In September 2008, M&M hired a computer technician to review M&M's computer to locate

any responsive electronic documents.  However, M&M only requested that its technician review the office computer, and not the garage computer.  M&M informed Chevron on September 18, 2008 that M&M's computer technician did not find any electronic documents on M&M's computer that were responsive to Chevron's discovery requests.  Docket No. 145.

77.  Chevron filed a motion on November 26, 2008 to compel M&M to produce documents and provide a verified, supplemental response in compliance with Judge Nakazato's July 30 Order. Docket 116.  In a December 30, 2008 order, Judge Nakazato denied Chevron's motion for contempt but directed that M&M:  "serve a verified second supplemental response . . . that must verify its supplemental responses to request nos. 18 and 19 include a diligent search of every computer used by Ms. Ehsani [sic] and Mr. Ghaneeian to store, record or keep track of M&M's revenues . . . [and] forthwith allow Chevron's forensic expert to inspect and make a full mirror image of said computer or computers to ascertain for itself whether all responsive documents have been produced or, not to imply anything sinister, whether any relevant information on the hard drive or drives have been destroyed, erased, or wiped. . . ."  Docket 127.

78.  M&M's forensic computer expert allegedly conducted an analysis in December 2008 and advised Chevron's forensic computer expert, Jonathan Karchmer ("Karchmer"), on January 6, 2009, that the "Shop" and "Mano" spreadsheets did not exist.  06/04/09 [Karchmer].

79.  In January 2009, Karchmer  reviewed forensic images of the hard drives of two of M&M's computers – one located in the "garage" and one located in the "office" – both of which were maintained on a computer network that allowed data on each computer to be shared and accessed using either computer terminal.  Karchmer immediately and easily located the electronic "Mano" and "Shop" spreadsheets on M&M's garage computer.  While these files contained the same data as the hard copies produced by Ehsani for the 1999 through September 2006 period, conspicuously absent is any data for the period October through December, 2006, which is contained in Ex 32 and 90.  Ex 238-006.  6/4/09 [Karchmer].

80.  Upon further examination, Karchmer discovered that another, much larger, set of the electronic "Mano" and "Shop" spreadsheets containing more data had been on M&M's "office" computer until at least April 2008, after which they were deleted.  These versions of the spreadsheets contained more data than in the surviving versions.  Ex 238-006.  Given the presence of data for October through December 2006 in hard copies, the Court finds that the shop.xls and expenses2.xls on Ex 133 were back-up copies, presumably overlooked by M&M personnel when the later and more complete electronic versions of the "Mano" and "Shop" spreadsheets were intentionally deleted.

81.  Karchmer discovered that, contrary to Ghaneeian's declarations and deposition testimony, these versions of the "Mano" and "Shop" spreadsheets on the "office" computer were regularly accessed by M&M personnel from October, 2007 through April 14, 2008 – seven months after Ehsani left M&M's employ.  Ex 238-006.  This finding directly contradicts Ghaneeian's allegations that the "Mano" and "Shop" spreadsheets were maintained secretly by Ehsani, unbeknownst to him.

82.  The deletion of the "Mano" and "Shop" spreadsheets on the M&M "office" computer after April 14, 2008 post-dates M&M's responses to Chevron's Document Requests and also coincides with the date that Chevron filed a motion to intervene (April 11, 2008) in the State Court Action to gain access to the Gray Documents.

83.  Only after learning that Karchmer located the electronic "Shop" and "Mano" spreadsheets on M&M's computer did M&M finally produce the "Mano" and "Shop" spreadsheets in hard copy at Ghaneeian's deposition on January 12, 2009.  Ex 111-113.

84.  Ghaneeian testified that from September 8, 2007 to the present Ghaneeian was the only person with authority to delete financial data from M&M's computers.  06/05/09 Vol. I at 117:12-119:9 [Ghaneeian].  Ghaneeian's verified statements and testimony that M&M did not

1   delete the "Mano" and "Shop" spreadsheets from its computers is not plausible, and the Court

2   finds that those statements were perjurious.

3

4   85.  On January 14, 2009, M&M served its Second Supplemental Response, verified by

5   Ghaneeian, in which M&M admits – contrary to Ghaneeian's prior sworn declarations – that the

6   handwritten Green Book ledger sheets "were shown to Mr. Ghaneeian by Ms. Ehsani on

7   approximately a monthly basis during Ms. Ehsani's tenure at the station . . ." but claimed that it

8   "has been unable to locate any original handwritten sheets that, in part, constitute the 'Green

9   Book'".  M&M claims that "[f]ollowing Ms. Ehsani departure from M&M in September 2007,

10  Mr. Ghaneeian has not seen any of these handwritten sheets nor has M&M maintained any such

11  sheets or been able to locate the original handwritten sheets Ehsani maintained while employed

12  at M&M."  Ex 240-004.

13

14  86.  On January 16, 2009, M&M produced disks containing electronic copies of the "Mano" and

15  "Shop" spreadsheets, but did not provide Chevron with the passwords to open the spreadsheets

16  until January 20, 2009.  Ex 133.  Upon receipt from M&M, Chevron provided the electronic

17  copies of "Mano" and "Shop" spreadsheets to Chevron's expert, Michael Spindler, on January

18  20, 2009, for analysis.  The data fields in the "Mano" and "Shop" spreadsheets provided

19  significant information as to the manner in which the figures were calculated.  Ex 239.

20

21  87.  The Court specifically finds that the "Mano" and "Shop" spreadsheets depicted in Ex 90

22  were intentionally deleted from M&M's computers by, or at the direction of, Ghaneeian in

23  violation of the Federal Rules of Civil Procedure and orders of this Court.

24

25  88.  At trial, Ghaneeian testified that he made a "diligent search" but was "unable to locate any

26  original handwritten sheets that, in part, constitute the Green Book."   06/05/09, Vol. I at

27  125:10-126:14 [Ghaneeian].

28

89.  M&M initially disputed the existence of the Secret Books – both the Shop and Mano spreadsheets and the handwritten ledgers.  It was not until Karchmer discovered Shop.xls and Expenses2.xls on the M&M computers that M&M acknowledged and later produced them.  Ex 111-113; 133.  Although Ehsani and other witnesses identified Ghaneeian's handwriting on Ex 32 and 90, M&M denied that the Green Book was an M&M record.  Ghaneeian finally admitted at his January 2009 deposition that he wrote significant and material portions (both words and numbers) of Ex 32 and 90.  Ex 90-442; 06/05/09, Vol. I at 126:5-17, 126:25-127:16, Vol. II at 11:16-12:2; 73:18-74:7 [Ghaneeian].

90.  The uncontroverted testimony at trial indicated that the only three people whose handwriting appears in the Green Book are 1999-employee Trina Rivera, as well as Ehsani and Ghaneeian.  06/05/09, Vol. I at 127:17-128:17 [Ghaneeian]; 07/08/09, Vol. I at 6:16-7:9, 14:7-16:12 [Ehsani].

91.  Notwithstanding Chevron's repeated requests and the orders of Judge Nakazato to both M&M and Ghaneeian to conduct a diligent search and to produce the handwritten ledgers of the Green Book, M&M and Ghaneeian have not done so.

92.  The uncontroverted evidence is that, from 2000 to the present, only Ehsani and Ghaneeian had access to the Green Book until September, 2007, when Ehsani delivered a few original pages to the IRS along with a complete photocopy.  Ehsani's extraordinary efforts to preserve the Green Book, laboriously making three photocopies of it, lead the Court to conclude that Ehsani does not have and did not destroy the original of the Green Book.  07/08/09, Vol. I at 16:20-19:20 [Ehsani].  Rather, the Court finds that M&M and Ghaneeian had possession of the Green Book when Ehsani's employment at M&M concluded on September 7, 2007.

93.  Ghaneeian offered no credible explanation for the disappearance of the Green Book.  At trial, he admitted that he understood that Chevron repeatedly demanded its production and that

M&M was obliged to produce the Green Book.  06/05/09, Vol. I at 130:23-132:6 [Ghaneeian]. He also admitted that he knew that he was prohibited from destroying any paper copies of the Secret Books. 06/05/09, Vol. I at 133:6-9 [Ghaneeian].

94.  The Court finds that Ghaneeian made numerous conflicting statements under oath, both in declarations and oral testimony.  The Court concludes that Ghaneeian is not credible and that he perjured himself in declarations and in his deposition and at trial.

95.  The Court finds that Ghaneeian willfully disobeyed this Court's order to produce substantial documents.

**Afsaneh Ehsani's Questionable Credibility**

96.  Serious questions as to Ehsani's credibility were also raised at trial.

97.  Ehsani worked at M&M as a bookkeeper from late 1999 until September 2007.  From late 1999 until January 2005, Ehsani reported an annual salary on her W-2's of $20,400 per year. From January 2005 until her resignation in September 2007, Ehsani reported an annual salary on her W-2's of $28,800.  During this entire period, however, it is highly likely that Ehsani received significantly more compensation than that which was reported on her W-2's.  Specifically, she likely received an additional amount of approximately $12,000 in cash per year, as well as thousands of dollars in various benefits (*i.e.,* health insurance, auto payments, and gas). 06/05/09, Vol. II, 40:6-15 [Ghaneeian]; 07/08/09, Vol. II, 8:15-20; 18:1-20:4; 21:15-25:10 [Ehsani].

98.  In February 2008, Ehsani sought to extort money from Ghaneeian.  Specifically, on February 26, 2008, Ehsani met with two laywers who represented Ghaneeian and demanded $100,000 in exchange for not turning over "damaging" documents to Chevron.  Ghaneeian refused Ehsani's demand.  Shortly thereafter, Ehsani produced what has been marked as Exhibit

90 to Chevron.  06/05/09, Vol. II, 56:23-60:3 [Ghaneeian]; 07/09/09 [Dease].

99.  However, among other testimony, Ghaneeian's long-time friend, Blush Momeny, contradicted Ghaneeian's assertions that Ehsani was romantically interested in Ghaneeian, stating that he too had partaken of Ehsani's home-cooked meals and that Ehsani's relationship with Ghaneeian was akin to that of a mother.  07/09/09 [Momeny].  The Court finds no evidence of a romantic relationship between Ehsani and Ghaneeian.

100.  Ehsani's lack of credibility is largely immaterial to this case, however, because (1) she is not a party to this action, (2) her testimony on issues material to the resolution of this matter is corroborated by other witnesses and documents, and (3) the requisite evidence against M&M stems from the relevant auditors' findings.  Ehsani's only crucial role was pointing the auditors to the Secret Books.  The Court finds that Ehsani did point the auditors to the Secret Books.  Oseguera corroborated her testimony regarding their communications.  Her testimony about Moe Baghai is corroborated by payroll records, the access code to the electronic Shop and Mano spreadsheets, and the records of cash payments to him from April, 1999 to December, 2001.

101.  Further, Ehsani's underreporting of her own income is at least partially attributable to M&M.  Ghaneeian hired her in 1999 and entrusted her to run the Station, and to be responsible for its financial reporting to Chevron, the State, and the IRS.  Chevron is entitled to have its dealer hire honest, trustworthy employees – especially the employee designated by the dealer to serve as the bookkeeper.

**M&M's Creation, Maintenance and Destruction of the Secret Books**

102.  M&M contended at trial that the Secret Books were all the work of Ehsani and not attributable to M&M and Ghaneeian.  The Court rejects M&M's claim and finds that the Secret Books were a more accurate record of M&M's financial condition and revenue for the years 2000 through 2007 than the official financial statements prepared by H&N.

103.  The electronic version of the Mano spreadsheet (EX 133) bears the legend: "'Expenses.xls' is reserved by Moe.  Enter password for write access, or open read only."  The electronic version of the Shop spreadsheet (EX 133) bears the legend: "'Shops.xls is reserved by Moe.  Enter password for write access, or open read only."  The Court finds that the Mano and Shop spreadsheets were created by M&M to reflect the actual financial data, including a more accurate report of ASB revenue than in its official financial statements.

104.  Mohammad ("Moe") H. Baghai ("Moe Baghai") testified that he was employed by M&M only in 1999 and that he left the employ of M&M to work for another Chevron service station by the end of December 1999.  He testified that, thereafter, he was not employed by, and provided no further services, to M&M.  Moe Baghai testified that during his employ at M&M he never received cash payments and that all of his compensation was paid by check.  Moe Baghai testified that, although both spreadsheets bear his name "Moe," he did not create the shop.xls or expenses2.xls spreadsheets.  Ex 133; 7/9/09 [Baghai].

105.  Contrary to Moe Baghai's testimony, the M&M payroll records for 12/01/01 - 12/15/01 reflect payment to him in the amount of $500 (Ex 90-179) and the M&M payroll records for 12/15/01 - 12/31/01 reflect payment to him in the amount of $500 (Ex 90-190)  in 2001 – two years after he claimed to have concluded his employment.

106.  Ghaneeian testified that Moe Baghai was an M&M employee in 2000 and identified him as the employee referenced as "Moe" in the Mano report for April, 2000 – i.e., the report which reflects cash payments to various M&M employees including $1,000 to Moe.  Ex 112-241 to 112-247, 133; 06/05/09, Vol. II at 4:11-5:18 [Ghaneeian].

107.  Consistent with the M&M payroll records and the evidence that certain M&M employees were paid partly by check and partly in cash (06/05/09, Vol. II at 67:8-10; 69:14-70:10 [Ghaneeian]), the Mano spreadsheet for the month of December 2001 also reflects payment to

25

"Moe" in the amounts of $590 and $1,000.  The Mano spreadsheet further reflects monthly cash payments of at least $1,000 to "Moe" from April, 2000 through December 2001. Ex 112-179 to 112-247; 133.

108.  In  light of the impeachment of Moe Baghai, the Court finds that the Mano and Shop spreadsheets (expenses.xls and shop.xls) were created by Moe Baghai at the direction of, and for the benefit of, M&M and that his testimony to the contrary was untrue.

109.  The Mano and Shop spreadsheets for April 2000 through December 2006 (Ex 111-113; 133) provide a detailed account of ASB revenue not reported in the official financial statements prepared by H&N.  The Mano spreadsheet details by date the unreported ASB work orders. For example, the Mano spreadsheet for August, 2004 details Fly-Away Work Orders totaling $8,575.33 (EX 90-446, 133) which corresponds precisely to Oseguera's summary of August, 2004 Fly-Away Work Orders.  Ex 117-005.

110.  The Shop spreadsheet provides a monthly accounting of revenue for April 2000 through December 2006, including ASB revenue not reflected in M&M's official financial statements nor reported in M&M's sales tax and income tax returns.  For the month of August 2004, the Shop spreadsheet reflects ASB revenue of $45,542.05; M&M's official financial statement reflects ASB revenue of $36,355; and the Chevron EPOS report reflects ASB revenue of $11,845.  Ex 6-014.

111.  Consistent with the Shop spreadsheet for August 2004, the Green Book reflects "SHOP" revenue of $46,542.05 in handwriting which Ghaneeian identified as his own.

112.  The Mano spreadsheet provides a detailed account of cash generated from ASB sales not reported to Chevron or to taxing authorities and the expenditure of that cash.  The Mano spreadsheet reflects regular monthly payments to Ghaneeian; his wife Fariba; to Bank of

1  America and Wells Fargo Bank (for Ghaneeian's VISA and MasterCard bills); and to employees

2  including but not limited to Moe, Ehsani, and Saaed. Ex 111; 133.

3

4  113.  The Shop spreadsheet calculated M&M ASB employees' commissions based on ASB

5  revenue using a unique formula for each employee.  Ex 112; 133; 07/08/09 Vol. I  at 39:4-40:17

6  [Ehsani].  M&M's use of the Shop spreadsheet to calculate employee bonuses confirms that the

7  ASB revenue figures in the Shop spreadsheet are more accurate than the revenue figures in

8  M&M's official financial statements and tax returns.

9

10  114.  Ghaneeian admitted that he met monthly with Ehsani and reviewed M&M's financials,

11  including the data from the Mano and Shop spreadsheets and that he would write the figures

12  from these reports to prepare the Green Book. EX 32, 90; 06/05/09, Vol. II at 90:14-91:8

13  [Ghaneeian]; 07/08/09, Vol. I at 80:1-81:13 [Ehsani].  Included in the Green Book each month is

14  a line in Ghaneeian's handwriting titled "M," which he used to reflect the funds he and his family

15  received directly in cash, in check, and for payment of personal credit cards.  06/05/09, Vol. II at

16  92:3-93:10 [Ghaneeian].   For example, in the month of August, 2004, the entry at "M" reflects

17  "34198 + 3.5."  Ex 90-442.

18

19  115.  Based on the Secret Books' meticulous record of revenue, cash receipts, and cash

20  expenditures, in both electronic spreadsheets and handwritten ledgers, the Court finds that

21  Ghaneeian, M&M's sole owner from 1998 and 50% owner with his former wife Fariba since

22  their 2008 divorce, knowingly directed that revenue not be reported to Chevron or taxing

23  authorities, and that cash generated from unreported ASB revenue be used to pay his and his

24  family's personal expenses and various employees.  06/05/09, Vol. II at 67:8-20; 69:14-70:10;

25  82:16-89:23 [Ghaneeian]; 7/8/09, Vol. I at 56:8-60:18; 63:1-65:19 [Ehsani].

26

27  116.  M&M claims, but failed to provide any evidence, that Ehsani "stole" money from M&M.

28  Even if that were true, it is immaterial to this Court's determination since Ghaneeian, as owner,

1  manager and Chevron-recognized dealer, was responsible for M&M's financial practices and
2  created an unlawful environment in which M&M paid cash to Ghaneeian and his family and
3  employees, and for Ghaneeian's personal expenses, with the intent of not reporting the payments
4  to the taxing authorities.

5

6  **Mano Ghaneeian's Lack of Credibility**

7  117.  As described above, Ghaneeian's statements in declarations, at deposition, and at trial
8  contradict one another and were also inconsistent with documents he admits having written,
9  leaving the inescapable conclusion that at least some, and perhaps all, of his testimony was
10  untrue.

11

12  118.  Ghaneeian's false statements to Chevron pre-date the instant case.  As referred to earlier in
13  discussing the first federal lawsuit brought by Chevron against M&M, in 1996, Ghaneeian
14  purchased a 49% interest in M&M, and, in April, 1998, he purchased the remaining 51% interest
15  from Flo Apeles and became the sole owner.  When Ghaneeian thrice failed the Chevron dealer
16  test and could not qualify as a Chevron dealer, he concealed his true ownership interest, and, in
17  2002, submitted to Chevron three sets of documents for the years 1999-2001 that falsely
18  represented that he was a minority owner and that Mr. Apeles still held the requisite 51% interest
19  as required by the Dealer Agreement.  06/05/09, Vol. II at 96:14-101:16 [Ghaneeian]; Ex
20  226-227; 229-237.

21

22  119.  M&M's claim that Ehsani masterminded the Secret Books beginning in 1999 is not
23  credible.  Ehsani had no motive when she began working for M&M in 1999 to create the Green
24  Book.  Likewise, she did not have the ability or any motive to create the Shop and Mano
25  spreadsheets in 2000.  Indeed, the only person who would have benefited from the falsified
26  records from 2000 through April, 2008 (long after Ehsani left) was Ghaneeian.  6/5/09, Vol. I at
27  129:17-20 [Ghaneeian].

28

120.  Since Ghaneeian is the Chevron-recognized dealer for M&M, his dishonesty, and submission of false documents to this Court, Chevron, the State, and likely the IRS render him a non-credible witness.

Based on the foregoing Findings of Fact, the Court now makes the following Conclusions of Law:

## CONCLUSIONS OF LAW

### JURISDICTION, VENUE, AND GOVERNING LAW

1.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 and 2202 (Declaratory Judgment Act), and 2801 *et seq*. (the Petroleum Marketing Practices Act). Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

2.     This case is governed by the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq*., which was enacted with the stated purpose of "protecting franchisees and consumers from exploitation by large petroleum companies and equalizing the bargaining power between the petroleum companies and the franchisees." *Chevron U.S.A., Inc. v. Mebtahi*, 148 F. Supp. 2d 1019, 1023 (C.D. Cal. 2000)(citing S. Rep. No. 731-95, U.S. Code Cong. & Admin. News 873, 875-77 (1978)).  The Dealer Agreements between Chevron and M&M relating to the service station created a petroleum "franchise" pursuant to 15 U.S.C. § 2801(1)(A).

3.     Under the PMPA termination of a franchise is proper if any of the following occurs (provided proper notice is given):  (a) The franchisee fails to "comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship. . ."  15 U.S.C. § 2802(b)(2)(A); (b) The franchisee fails to make a good-faith effort to carry out any provision of the contract "without consideration of the reasonableness of the

1   term as long as the franchisee is given an opportunity to comply with the term in question" 15

2   U.S.C. § 2802(b)(2)(B); or (c) Upon "[t]he occurrence of an event which is relevant to the

3   franchise relationship and as a result of which termination of the franchise or nonrenewal of the

4   franchise relationship is reasonable. . ." 15 U.S.C. § 2802(b)(2)(C).  In this case, termination is

5   proper under both 15 U.S.C. § 2802(b)(2)(A) and (C).

6

7   **OCCURRENCE OF EVENTS THAT MAKE TERMINATION REASONABLE UNDER**

8   **15 U.S.C. § 2802(b)(2)(C)**

9   4.      M&M's failure to accurately report its sales to Chevron constitutes the "occurrence of an

10  event which is relevant to the franchise relationship and as a result of which termination of the

11  franchise or nonrenewal of the franchise relationship is reasonable . . ." 15 U.S.C. §

12  2802(b)(2)(C).

13

14  5.      Section 2802 of the PMPA lists examples of franchisee conduct that, by definition,

15  constitute "an event which is relevant to the franchise" and as a result of which "termination is

16  reasonable." 15 U.S.C. § 2802(c)(1)-(12).  Conduct falling within section 2802(c)(1)-(12)

17  constitutes grounds that are per se reasonable for terminating a franchise.

18

19  6.      As set forth above, there is uncontroverted evidence which supports at least two per se

20  grounds for termination:

21  (a)     "[F]raud or criminal misconduct by the franchisee relevant to the operation of the

22  marketing premises." 15 U.S.C. § 2802(c)(1), and

23  (b)     "[F]ailure by the franchisee to pay to the franchisor in a timely manner when due all sums

24          to which the franchisor is legally entitled." 15 U.S.C. § 2802(c)(8)

25

26  7.  Section 2802(c)(1) has no materiality limitation – any fraud or criminal misconduct by M&M

27  that is relevant to the operation of the franchise is a proper ground for termination of the

28  franchise.  Fraud must generally be knowing and intentional, *see, e.g.*, BLACK'S LAW

1  DICTIONARY 670 (7th ed., 1999) and the Court finds that M&M both knowingly and

2  intentionally misrepresented its income.

3

4  8.  Section 2802(c)(8) does have a limitation:   "The term 'failure' does not include – (A) any

5  failure which is only technical or unimportant to the franchise relationship; (B) any failure for a

6  cause beyond the reasonable control of the franchisee; or (C) any failure based on a provision of

7  the franchise which is illegal or unenforceable under the law of any State (or subdivision

8  thereof)."  Said limitation is not met in this case.

9

10  9.  The Court concludes that M&M systematically and deliberately underreported ASB revenue

11  at least for the period 2004-2006.  M&M committed fraud by misrepresenting to Chevron its true

12  sales.  M&M did so by doing at least the following:

13  (a)      Hiding ASB Revenue;

14  (b)      Creating the Secret Books to record ASB work orders not recorded in M&M's official

15  financial statements and reports to Chevron;

16  (c)      Failing to produce to Chevron and Oseguera documents that M&M was contractually

17  obligated to produce, including but not limited to, the Secret Books; and

18  (d)      Making false statements to Oseguera about the existence of the Secret Books.

19

20  10.  M&M's fraud was "relevant to the operation" of the Station for purposes of Section

21  2802(c)(1) because it involved M&M's efforts to hide from Chevron M&M's true sales at the

22  Station.  Such sales were used by Chevron to calculate the Percentage Rent M&M owed

23  Chevron.  That is, M&M violated the revenue reporting, record keeping and audit requirements

24  prerequisite to being relieved of the Base Rent and to obtaining the lower Percentage Rent.

25  Based on M&M's failure to produce to Oseguera during his review documents required under the

26  Dealer Agreements and its falsification of financial records, the Court concludes that M&M did

27  not pay to Chevron all Percentage Rent due.  As a consequence, M&M owes Chevron the Base

28  Rent for the period from July, 2005 to present, which it did not pay.  The Court will never be

able to calculate the exact amount of rent owed to Chevron.  As but one example of the difficulty assessing the rent that Chevron would have received had M&M accurately reported its income, the Court does not know what Chevron would have set M&M's rent at, in the July 2005 Rent Waiver, had it been able to draft the Rent Waiver based on accurate past revenues.

11.  The Court concludes that M&M's failure to pay rent was material and relevant to the operation of the franchise.  Further, the Court finds that termination of the Dealer Agreements was also reasonable and proper under 15 U.S.C. § 2802(c)(8)("[T]he the term 'an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable' includes events such as – [] failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled....").

**M&M'S FAILURE TO COMPLY WITH REASONABLE AND MATERIAL PROVISIONS OF THE DEALER AGREEMENTS UNDER 15 U.S.C. § 2802(b)(2)(A)**

Failure to provide documents required for audit

12.  As stated earlier, M&M failed to maintain records as required by the Rental Accounting Guide and breached Section 4(d) of the Dealer Lease.   A requirement that M&M maintain records in accordance with the Rental Accounting Guide is further grounds for termination, as it considered a reasonable contract provision under 15 U.S.C. § 2802(b)(2)(A), because, among other things, it permits Chevron to verify that all of the service station's sales – which form the basis for the calculation of M&M's rent – have been reported to Chevron.  *Nahabet v. Chevron U.S.A. Inc.*, 2001 WL 1800904 at *7-8 (C.D. Cal. 2001), aff'd by 49 Fed. Appx. 723 (9th Cir. 2002)("The provisions requiring Defendant to maintain particular books and records and produce them for an audit are both reasonable and of material significance to the franchise relationship between Plaintiff and Defendant. Defendant's rent is based, in part, on Defendant's sales at the convenience store portion of the service station. Without the provisions described

above, Plaintiff would be forced to accept the sales figures of Defendant without any ability to confirm the veracity of those figures. Defendant would then be able to effectively set its own monthly rent without any fear of discovery by Plaintiff. Such a transfer of power is not contemplated by or in accord with the fundamental principles of the franchisor-franchisee relationship.).

13.   As stated earlier, M&M's failure to produce to Oseguera all of its financial records relating to the Station – and making false statements to Oseguera about the existence of such documents – deprived Chevron of its contractual right to verify M&M's reported sales by reference to contemporaneous source documents.  Chevron cannot confirm whether M&M reported all sales as required by the Dealer Agreements and thus whether Chevron collected all rent to which it was entitled from M&M.

14.  M&M's violation of the reasonable contract requirement that it maintain records in the manner required by the Dealer Agreements is also of material significance to the franchise relationship under § 2802(b)(2)(A).  *See Gulessarian,* CCH Bus. Franchise Guide, ¶11,975 (C.D. Cal. 2000) (provisions requiring financial records to be maintained are reasonable and of material significance to the franchise relationship within the meaning of PMPA § 2802(b)(2)(A)).

Failure to report all sales to Chevron

15.  M&M's failure to report all sales to Chevron is further grounds for termination, as it is also considered a reasonable contract provision under 15 U.S.C. § 2802(b)(2)(A), particularly since M&M opted for the Percentage Rent which requires that dealers fully and accurately report their sales to calculate the monthly Percentage Rent due to Chevron.

16.  Where rent is based on a "trust but verify" system, Chevron cannot be forced to do business with a dealer who lies. *Baker v. Amoco Oil Co.*, 956 F.2d 639, 642-643 (7th Cir. 1992)

1    ("Cheating by even a small amount on a contract is significant. . . . Amoco need not furnish

2    gasoline to a person who cannot be relied on to account for the sale accurately").

3

4    17.  M&M's failure to fully and accurately report its sales to Chevron in the manner required by

5    the Dealer Agreements authorizes termination of the Dealer Lease under Section 7(b)(1) of the

6    Dealer Lease.

7

8    **THE PMPA DOES NOT REQUIRE PROOF OF ECONOMIC HARM**

9    18.  M&M argues that, notwithstanding the incontrovertible evidence of underreporting of

10   revenue to Chevron and taxing authorities, the dealership should not be terminated unless

11   Chevron has suffered economic harm.  As set forth above, the Court finds that Chevron suffered

12   economic harm in at least two respects:  (1) M&M elected to pay Percentage Rent instead of the

13   higher Base Rent, but M&M did not comply with the revenue reporting requirements which are

14   a prerequisite to the lower Percentage Rent payment; and  (2) the ASB percentage rent threshold

15   ($37,210) for the July, 2005 Lease presumably was based on the historical ASB revenue.  M&M

16   underreported its ASB revenue for at least 2004, which provided a lower threshold for setting the

17   Percentage Rent threshold.

18

19   19.  The PMPA does not require that the franchisor suffer direct economic harm as a

20   precondition to terminating its relationship with a franchisor, provided valid grounds for

21   termination under the PMPA exist – such as those enumerated above.  Congress has expressly

22   recognized that termination would be proper in cases where the franchisor's misconduct was

23   clear, but the economic impact on the franchisor was not:

24   "Some contractual violations, although not readily reducible to a dollar value, may be so serious

25   as to undermine the entire relationship.  In such cases, termination may be the only means

26   available to the franchisor to assure against further violations in the future.  Thus, the remedy

27   may be particularly appropriate where a course of conduct is involved and the need is thereby

28   demonstrated to protect against further injury resulting from the likelihood of a repeated

1   violation in the future."  S. Rep. No. 95-731, at 18, reprinted in 1978 U.S.C.C.A.N. 873, 876.

2

3   20.  The Ninth Circuit focuses on the effect of the franchisee's conduct on the overall

4   relationship between franchisor and franchisee.  *E.g., Humboldt Oil Co. v. Exxon Co., U.S.A.*,

5   695 F.2d 386, 389 (9th Cir. 1982).  Accordingly, a "[g]ood faith belief of the franchisor that the

6   franchisee is untrustworthy or engages in fraudulent practices undermines the entire franchise

7   relationship" (*id*.) and warrants termination.

8

9   21.  Moreover, where as here, termination is based upon one of the per se reasonable grounds

10  enumerated in 15 U.S.C. §§ 2802(c)(1)-(12), the inquiry stops, and termination is proper, once

11  the statutory grounds are proved.  No further discussion into the reasonableness of the

12  termination is proper if a section 2802(c) termination ground is established.  *Atlantic Richfield*

13  *Co. v. Guerami*, 820 F.2d 280, 283 (9th Cir. 1987).

14

15  **THE NOTICE OF TERMINATION**

16  22.  The PMPA requires that the notice of termination be issued not more than 120 days after the

17  franchisor first acquired actual or constructive knowledge of the event that gives rise to the basis

18  for termination or nonrenewal of the franchise relationship.  PMPA §§ 2802(b)(2)(A)(i) and

19  2802(b)(2)(C)(i).  PMPA § 2804(a)(1) provides, *inter alia*, that the Notice of Termination must

20  be in writing, must be delivered to the franchisee or sent by certified mail, and must set forth the

21  grounds upon which the franchisor seeks to terminate its relationship with the franchisee.

22  Chevron's Notice of Termination complied with the requirements of PMPA §§ 2804(a)(1) and

23  2804(c).

24

25  **M&M'S PRETEXT ARGUMENT AND COUNTERCLAIM ARE MERITLESS**

26  23.  M&M concedes that its counterclaim "is essentially the mirror image of Chevron's claim for

27  declaratory relief."  M&M's Amended Memorandum of Contentions of Fact and Law.  Docket

28  132 at 6:21-22.

24.  M&M contends that the termination was not based on the reasons stated in the Notice of Termination, but rather motivated by Chevron's desire to "get the Station for free."  For the reasons stated above, whatever interest Chevron may have had in operating the Station, the evidence is overwhelming that the termination was based solely upon the reasons set forth in the Notice of Termination.  In particular, the decision to issue the Notice of Termination was independent of any desire to take over the Station.  M&M has not introduced any evidence that would support a claim that the termination was pretextual.  *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464 (9th Cir. 1993).

**M&M'S FALSE TESTIMONY AND SPOLIATION OF EVIDENCE**

25.  Ghaneeian, personally and on behalf of M&M, made false statements under oath in this action, in documents filed in response to the orders of Judge Nakazato, in deposition testimony and at trial on June 5, 2009, denying the existence of M&M's financial documents that this Court ordered produced to Chevron.  M&M also destroyed M&M financial documents that it was obliged to produce to Oseguera during his Review and which Judge Nakazato ordered produced to Chevron.

26.  Ghaneeian testified that he was the only person with authority to order deletion of M&M's computerized financial records.  Accordingly, the Court finds that M&M's financial documents were either destroyed by Ghaneeian, or at Ghaneeian's direction, and that the spoliation was knowing and intentional.

27.  M&M's willful and persistent misconduct during this litigation and violation of Court orders requires the imposition of meaningful sanctions.  The court may issue sanctions under two sources of authority: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Federal Rule of Civil Procedure 37 against a party who 'fails to obey an order to provide or permit discovery.'"  *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006).

**Rule 37 Sanctions**

28.  Federal Rule of Civil Procedure 37(b)(2)(A) provides that courts may impose sanctions – including evidence exclusion and issue preclusion – to punish a party for failing to obey the court's discovery orders.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982); *Von Brimer v. Whirlpool Corp*., 536 F.2d 838, 843 (9th Cir. 1976).

29.  At M&M's request, the Court deferred ruling on the Motion in Limine concerning M&M's failure to comply with its discovery obligations and allowed M&M to present its case.  The evidence preclusion sanctions requested by Chevron are just and appropriate sanctions for M&M's egregious behavior that significantly delayed the litigation and caused undue burden and expense to the Court and to Chevron.

**Sanctions under the Court's Inherent Powers**

30.  The Court possesses inherent discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial.  *Unigard Security Ins. Co. v. Lakewood Engineering & Manufacturing Corp.*, 982 F.2d 363, 368 (9th Cir.1992).

31.  Under its inherent powers, the Court can also impose a sanction that provides for the adverse inference that "evidence made unavailable by a party was unfavorable to that party." *Nursing Home Pension Fund v. Oracle Corp.*, 2008 WL 4093497 at *4 (N.D. Cal. 2008).

32.  For the Court to impose an adverse inference sanction, Chevron must demonstrate: "'(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'"  *Nursing Home*, 2008 WL 4093497 at *5 (citations omitted); see also In re Napster, Inc. Copyright Litig., 462 F.Supp.2d 1060, 1077 (N.D. Cal. 2006).

33.  Documents are destroyed with a culpable state of mind if the party had "'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"  *Nursing Home*, 2008 WL 4093497 at *6.


34.  M&M was obligated, both by contract and federal law, to maintain and produce the destroyed financial documents.  M&M deleted and destroyed substantial, relevant evidence.  Chevron's forensic analyst determined that after April 2008 – 10 months after this litigation began – that larger electronic versions of the "Mano" and "Shop" spreadsheets were deleted from M&M's computers.  Particularly troublesome is that this deletion coincided with Chevron's intervention in the State Court Action in which Chevron sought access to the Gray Documents that contained the Secret Books.  M&M denied, and Ghaneeian repeatedly lied under oath about the existence of the Secret Books.


35.  M&M's production of earlier, less complete versions of the "Mano" and "Shop" spreadsheets on the eve of the scheduled trial date did not cure its spoliation of documents because they are incomplete copies and were untimely, causing undue prejudice to Chevron.  As the *Nursing Home* court noted, "it is impossible to know whether additional unproduced emails were also deleted or not turned over."  *Nursing Home*, 2008 WL 4093497 at *6.  M&M has yet to produce the handwritten Green Book despite Mr. Ghaneeian's eventual, grudging acknowledgment at trial of his role in its creation.


**Monetary Sanctions under Both Rule 37 and the Court's Inherent Powers**

36.  Monetary sanctions are available under both Federal Rule of Civil Procedure 37(b) and the Court's inherent powers.  *Marquis v. Chrysler Corp.*, 577 F.2d 624, 641-42 (9th Cir. 1978).


37.  "[I]f a failure to comply [with a discovery order] has occurred, it becomes incumbent upon the disobedient party to show that his failure is justified or that special circumstances would make an award of expenses unjust."  *David v. Hooker, Ltd.*, 560 F.2d 412, 419 (9th Cir. 1977).

1     "Willfulness" is not a necessary element for the imposition of expenses and attorney's fees under

2     Rule 37. *Id.*

3

4     38.  Monetary sanctions are available under a court's inherent powers upon an express finding

5     that the sanctioned party's behavior "constituted or was tantamount to bad faith," which is

6     demonstrated when a party "delay[s] or disrupt[s] the litigation or hamper[s] enforcement of a

7     court order." *Leon*, 464 F.3d at 961 (citation omitted).  The Court finds that M&M's discovery

8     misconduct constitutes and was tantamount to bad faith.

9

10     39.  Accordingly, under the Court's inherent powers and F.R.C.P. 37, the Court imposes the

11     following sanctions:

12     (a)      The Court deems established – and draws an inference adverse to M&M and concludes

13     that the documents spoliated by M&M support Chevron's allegations of the following facts:  (i)

14     the Secret Books (Ex 90; 111-113 and 133) are M&M's financial records; (ii) M&M's failure to

15     produce the Secret Books to Oseguera during his examination of M&M in May 2007 was a

16     breach of the Dealer Agreements; (iii) the Secret Books reflect the financial revenue and expense

17     figures of M&M, including but not limited to M&M's ASB revenue; (iv) the Secret Books

18     contain revenue that is not reported to Chevron or, likely, to taxing authorities; and (v) M&M

19     failed to pay Chevron rent in breach of the Dealer Agreements.

20     (b)      The Court imposes monetary sanctions of $25,000 against M&M to reimburse Chevron

21     for the substantial expenses needlessly incurred due to M&M's discovery misconduct and

22     Ghaneeian's perjury.

23

24     **RECOVERY OF ATTORNEYS' FEES**

25     **Fees under the Dealer Lease**

26     40.  Section 23 of the Dealer Lease provides that in the event of a lawsuit between Chevron and

27     the Dealer arising out of or relating to the transactions or relationship contemplated by this Lease

28     "the substantially prevailing party shall be entitled to recover its reasonable costs of the suit

1  including reasonable attorneys' fees."

2

3  41.  This lawsuit relates directly to M&M's breach of the Dealer Agreements by its failure to

4  produce critical financial documents to Chevron and its systematic underreporting of revenue to

5  both Chevron and the taxing authorities and the underpayment of taxes.  As the prevailing party,

6  Chevron is also entitled to recover its attorneys' fees pursuant to Section 23 of the Dealer Lease

7  and shall submit declarations in proof thereof.

8

9  **DISPOSITION**

10  42.  M&M has committed breaches of material terms of the Dealer Agreements, Chevron is

11  entitled to terminate the Dealer Agreements for the Station in accordance with the Termination

12  Notices.

13

14  43.  Ghaneeian must surrender possession of the Station pursuant to the Dealer Agreements upon

15  the termination of the Dealer Agreements no later than midnight on September 7, 2009.

16

17  44.  Chevron is awarded such attorneys' fees and costs as are provided for under Section 23 of

18  the Dealer Lease.  Such fees shall be determined by separate, future motion after Chevron has

19  filed the requisite declarations and proof thereof.

20

21  45.  Ghaneeian must pay $25,000.00 to Chevron as sanction for its violation of court orders and

22  discovery obligations.

23

24  IT IS SO ORDERED.

25  DATED: August 6, 2009

26

27  _David O. Carter_
   _____

28  DAVID O. CARTER
    United States District Judge